EDWARD GAY CROW, by EDWARD W. TERRY, His Guardian, and ALEXANDER CROW, Trustee under the will of SOPHIE M. CROW, v. KATHERINE MARCHAND CROW-HUMPHREY, Appellant.—73 S. W. (2d) 807.

Division Two, July 9, 1934.

*Parker, Jackson & Grossenheider* and *Paul A. Richards* for appellant.

638

*Goodbar & Gilster, Thomas P. Moore, Charles M. Hay and George F. Heege* for respondents.

COOLEY, C.—This case, which comes to the writer on reassignment, is a suit in equity to enjoin the enforcement of a judgment for alimony. Plaintiffs prevailed below and the defendant appealed. Edward Gay Crow is a person of unsound mind. Alexander Crow is his son by his first marriage, to whom Sophie M. Crow, mother of Edward, bequeathed certain property in trust for Edward. No question is raised as to the propriety of joining said trustee as co-plaintiff in this action.

Plaintiff's evidence tended to show that about 1905 or 1906 and prior thereto, Edward Gay Crow was a young man of considerable

promise, a total abstainer from alcoholic drinks, prominent in church work, neat, in fact rather meticulous, in dress. He had no property but was entrusted with the management of the business affairs of his mother, Sophie M. Crow, who appears to have been a woman of considerable wealth, and with the management of some business matters for other relatives. These business affairs he seems to have managed satisfactorily to the owners. He was married and had three children. About 1905 Mr. Olian, an intimate friend and associate who had known him from boyhood, began to notice peculiarities in his manner and conduct that led him to think Crow's mind was becoming diseased. He spoke to Crow's mother and his then wife about it. At about that time Crow began drinking and according to Mr. Olian from that time on his mental condition grew progressively worse. In 1906 his first wife divorced him, being granted custody of the children and monthly alimony, which Sophie M. Crow paid. Also about 1906 Sophie M. Crow took the management of her business affairs from her son and entrusted it to Olian, arranging with the latter to pay Edward, who then had no property or income and no occupation, a monthly allowance.

Edward married Katherine Marchand, defendant in this action, February 24, 1909, and they lived together until August 29, 1912, when they separated and never thereafter lived together. Shortly prior to this marriage Edward informed his friend Olian that he was going to get married and Olian advised against it, telling Edward his mother might cut off his allowance. Edward replied that she could not do that, as he "had a birthright." Mrs. Crow did cut off the allowance for a time but later restored it. By this time Edward had got to drinking excessively and had become or was becoming slovenly in his habits and in Olian's opinion was showing increasing signs of mental aberration. Olian detailed various incidents tending to show abnormality that occurred during the three and a half years Edward and Katherine lived together, which we think it unnecessary to detail.

About August 11, 1912, defendant Katherine filed in the Probate Court of St. Louis an application, verified by her, praying the appointment of a guardian for said Edward, alleging that he "is so addicted to habitual drunkenness and the intemperate use of alcoholic stimulants as to be incapable of managing his affairs; that his habits as to the use of said liquors are such that he is a constant menace to the personal safety of himself, of your petitioner and of other persons; that he is entirely incapable of managing his affairs or properly taking care of his person and property. Your petitioner further states that the said Edward G. Crow is so far disordered in his mind as to endanger his own person and the person and property of your petitioner and of others." This petition was later withdrawn. In the latter part of the same month an incident happened,

thought by witnesses to indicate irrationality, which led to the separation.

Crow continued the excessive use of intoxicants until June, 1914, when he was taken to Glenwood Sanitarium, an institution for inebriates and feeble-minded, in the hope that a cure might be effected. He was released four months later. Thereafter his condition continued to grow worse and in December, 1918, he was again placed in said institution where he has since remained. During his incarceration there he was observed by physicians and attendants who testified that in their opinion he was suffering from *dementia precox,* a form of insanity, and was probably suffering from that disease at the time of his marriage to defendant. Their evidence tends strongly to show that at least from the time of his second incarceration in the sanitarium in December, 1918, he has been insane and incapable of transacting any business.

On March 4, 1920, the defendant herein filed in the Circuit Court of the City of St. Louis, a suit for divorce and alimony against said Edward Gay Crow. As grounds therefor she alleged in her petition the marriage; that the parties had lived together thereafter until August 29, 1912; that defendant, Edward, had without cause, absented himself from her "for the space of one year and more, to-wit, from and since the 29th day of August, 1912, to the present time;" that during the last two years she had lived with him he had been addicted to habitual drunkenness; that he "has been guilty of such conduct as to constitute him a vagrant . . . in that, being an able bodied man, capable of supporting this plaintiff, he has wholly failed and neglected so to do;" and that he had offered her divers indignities, specified in the petition, while they lived together. It then alleged that said Crow "has real and personal property of great value and has a monthly income of three hundred ($300) dollars a month, or more;" that said Crow was a resident of St. Louis County, Missouri, to which county the petition asked that process be directed. Nothing was said in the petition about Crow's mental condition or that his alleged "residence" in St. Louis County was incarceration in a sanitarium there located. Process was issued, directed to St. Louis County and the officer's return showed personal service thereof upon Crow. Shortly after that service of process Sophie M. Crow, who it appears was quite willing to have her son and his wife divorced but desired it to be accomplished without notoriety, employed an attorney, Mr. Taylor R. Young, and she and Mr. Young went to the sanitarium to see Crow. Young tried to talk to Crow but could get no intelligible answer from him. Crow would only mumble and talk to himself, "didn't seem to understand and didn't say anything that was intelligible." Young then told Sophie M. Crow that he could not represent Edward. He testified at this trial: "I afterwards consulted Frank Slater, attorney for Katherine Mar-

chand Crow (in the divorce suit), and said to him,—'Frank you can't get a divorce against this man Crow; he is crazy, you will have to dismiss your suit.' Mrs. Crow (Sophie) wants me to file a suit to annul the marriage, and I have advised her that is the only thing she can do. She doesn't want the notoriety; she would rather pay than to have any notoriety, providing your terms are anything like within hailing distance or reason.'' Young further testified in substance that after several more interviews between him and Mr. Slater an agreement was reached that Sophie M. Crow would pay on behalf of her son to Katherine $150 per month, and a $200 attorney fee. Young said he did not think he used the word ''alimony'' in conferring with Slater; that he did not mean alimony; that what he agreed to was a stipulated monthly amount to be paid by Sophie M. Crow; that he told Sophie M. Crow the divorce, if granted, would not be valid because of Edward's insanity; that she ''wanted a divorce decree to be entered, . . . and on behalf of Mrs. Sophie M. Crow it was agreed that a judgment for $150 a month was to be entered in favor of the plaintiff and against defendant in said divorce action, and that Mrs. Sophie M. Crow would pay this amount monthly, although I did not consider it an alimony judgment, because it was my opinion that no valid judgment for alimony could be entered with a man not in court;'' that he did not appear or attempt to appear in court for Edward Gay Crow, whom he did not represent, but was in the courtroom at the hearing of the divorce case in behalf of Sophie M. Crow, to see that the decree entered did not call for the payment of more than $150 per month; that he took no part in the proceedings and was not authorized to do so unless an attempt should be made by the plaintiff to obtain a judgment for alimony in excess of $150 per month, in which event he was to intervene by informing the court of Edward Gay Crow's mental condition. That contingency did not arise. No guardian *ad litem* was appointed for Edward Gay Crow in the divorce proceeding and he was not there represented by any one authorized to speak for or defend him. Judgment was entered for divorce and for permanent alimony at the rate of $150 per month and for $200 attorney fees. The court was not informed of Crow's insanity or of his incarceration in the sanitarium, facts then well known to the plaintiff in the divorce action, nor apparently was the court informed of his utter inpecuniousness and lack of earning capacity, also well known to her. The scope of the evidence in the divorce case is not shown by the record herein, but it is evident from the record the alimony judgment was the result of the agreement above mentioned and was rendered without the hearing of evidence on that issue. It is needless further to detail the evidence relative to Edward Gay Crow's insanity. It was clearly shown and is virtually conceded that at the time of the filing and hearing of the divorce suit he was

and for a considerable time theretofore had been insane and mentally incompetent to employ counsel or present any defense he might have had to that action; that he was destitute financially, with no earning capacity and no prospect of ever having such capacity; and that his condition was known to the plaintiff in the divorce suit when she filed that suit and when it was tried. She did not offer to testify in the instant case and Mr. Slater, her attorney in the divorce suit, was dead when this case was tried.

Immediately after the rendition of the divorce and alimony judgment Sophie M. Crow, through her attorney, paid to Mr. Slater, for his client, $350, being the $200 attorney fee agreed upon and the first $150 monthly installment of "alimony." About a month later Katherine Marchand Crow married a Mr. Humphrey, with whom she was still living at the time of this trial. No further payments of alimony were made, nor does it appear that defendant herein made any effort to collect further payments until after the death of Sophie M. Crow, which occurred about July 2, 1929. By her will said Sophie left certain property, the nature and amount of which is not shown, to Alexander Crow as trustee for said Edward Gay Crow, still confined in the sanitarium and hopelessly insane. Defendant then threatened to enforce her alimony judgment, which had accumulated to more than $14,000 exclusive of interest, and began taking steps looking to that end. On July 29, 1929, she filed a suit to contest the will of Sophie M. Crow, as to the further progress of which the record does not inform us. The pleadings in effect concede her intention to enforce the alimony judgment against Edward Gay Crow's interest in his mother's estate by whatever means may be available. In September, 1929, Mr. Terry was appointed guardian of Edward Gay Crow and on February 25, 1930, he filed this suit to enjoin the threatened enforcement of said judgment for alimony, on the ground that the judgment was and is void because of Crow's insanity and for fraud practiced upon him and upon the court in its procurement. Prior to Terry's appointment Edward Gay Crow had no guardian. The petition herein is long and need not be set out. It sufficiently pleads the facts. It was not assailed below nor is it here. The circuit court found the issues for plaintiffs, that the allegations of the petition were sustained by the greater weight of the evidence, and that the decree of divorce and judgment for alimony had been obtained by fraud perpetrated upon the court and upon said Edward Gay Crow by the plaintiff in the divorce action, defendant herein, and by its judgment perpetually enjoined said defendant from "prosecuting or collecting" or attempting to prosecute or collect said judgment for alimony or any part thereof "by execution or otherwise."

■ Appellant first contends that process and judgment go against an insane person as against others, and that the judgment in the

divorce case was not void notwithstanding the defendant therein was insane and was not represented; and that insanity of a person against whom a judgment is rendered is no ground for setting aside the judgment when such person was regularly served with process and failed to make a defense. She cites Heard v. Sack, 81 Mo. 610; Gibson v. Pollock, 179 Mo. App. 188, 166 S. W. 874; Graves v. Graves, 255 Mo. 468, 164 S. W. 496, 500. Those cases hold that a judgment, regular on its face, rendered against an insane person on personal service, without representation in court, is not void, but they recognize that it is voidable and may be set aside. In Heard v. Sack, Heard's land had been sold under a judgment for taxes rendered against him when he was insane. He later brought suit by guardian, against the purchasers at the tax sale to set aside the deeds. Such purchasers had no information at the time of their purchase of Heard's alleged insanity when the tax judgment was rendered. It was held that the tax judgment was not void but only voidable and that, as innocent purchasers, they took good title. But the court said that if it had been averred and shown that they had had notice of Heard's mental condition the judgment setting aside the deeds might be sustained. In discussing the question the court said, 81 Mo. l. c. 615: ''The contracts of non-sane persons, not under guardianship, are placed by most respectable authorities, on the same basis as those of infants; and, therefore, by parity of reasoning, should alike be voidable.'' And again, 81 Mo. l. c. 617: ''If the infant may avoid a judgment against him, when his infancy was not disclosed, reason and justice would apply the rule with equal force to a lunatic.''

In Graves v. Graves, supra, which was a suit in equity to set aside a judgment against an insane person, it is said that, while a lunatic may be sued by having personal service of summons upon him, a guardian *ad litem* should be appointed, upon suggestion of insanity, to conduct his case under the supervision of the court and (255 Mo. l. c. 483, 164 S. W. 496, 501): ''When such is done, then the judgment binds the lunatic. But the trouble with the case at bar is that this petition seems to aver that this judgment in the original case was rendered without such steps. If so it states a good cause of action. If no guardian *ad litem* was appointed, then the lunatic never had his day in court in the full sense of the term, and a judgment rendered against him after a suggestion of lunacy as here, would smack of legal if not actual fraud.''

Appellant concedes in her brief that ''fraud in the procurement of a judgment against a sane or insane person is ground upon which it may be set aside or *its execution enjoined*'' (italics ours), but she contends that such fraud must be fraud practiced in the procurement of the judgment; that it is not sufficient that the cause of action upon which the judgment was founded was vitiated by

fraud, unless the interposition of the fraud as a defense has been prevented by fraud of the opposite party. Such is the general rule, as stated in Lieber v. Lieber, 239 Mo. 1, 31, 143 S. W. 458, quoting from 16 Am. and Eng. Ency. Law (2 Ed.), page 380. The Lieber case is cited by appellant. It reviews many cases from this jurisdiction, and quotes (239 Mo. 1. c. 44, 143 S. W. 458, 471) as expressive of the accepted doctrine in this State the following from United States v. Throckmorton, 98 U. S. 61: ''Where the unsuccessful party has been prevented from exhibiting fully his case, by fraud or deception practiced upon him by his opponent, as by keeping him away from court, a false promise of a compromise; or where the defendant never had knowledge of the suit, being kept in ig-norance by the acts of the plaintiff; or where an attorney fraudulently or without authority assumes to represent a party and connives at his defeat; or where the attorney regularly employed corruptly sells out his client's interest to the other side; these, and similar cases which show that there has never been a real contest in the trial or hearing of the case, are reasons for which a new suit may be sustained to set aside and annul the former judgment or decree, and open the case for a new and fair hearing.''

We think the facts of this case bring it within the rule. Had the facts relative to Edward Gay Crow's mental condition been disclosed to the court at the hearing of the divorce case it would have been the court's duty to appoint a guardian *ad litem* for him. That was requisite to the end that his rights might be protected. Moreover, the State has an interest in the maintenance of the family relation and it has been said occupies the relation of a third party in divorce proceedings. [See Bethel v. Bethel, 181 Mo. App. 601, 164 S. W. 682.] Without doubt had the court been apprised of the true situation it would have taken the necessary steps to protect the insane man's rights and to insure a real hearing of the case on its merits. Realizing this, the defendant, plaintiff in the divorce suit, not only did not disclose the facts but studiously concealed them from the court. Her petition was so drawn as to avoid any suggestion of Crow's insanity or incarceration in an asylum. Several of the grounds of divorce alleged were so worded as to give the impression that they had occurred within a time recently before the filing of the suit when defendant herein well knew her husband was mentally irresponsible for his acts. The evidence herein indicates that he may have been irresponsible from the time of the marriage. It will not do to say that Crow was represented at the hearing by his mother or her attorney. Without meaning to impugn her motives, she had no legal right to agree for her son, as she virtually did, that the court should be kept in ignorance of the facts and be permitted, in effect induced, to render a decree of divorce, unopposed, and a judgment for alimony against him, agreed upon between her and the plaintiff

in the divorce suit. Moreover, it is apparent that the mother was acting for herself rather than for her insane son. She wanted the marriage dissolved. She may have thought that best for her son, but she had been advised that a valid judgment could not be rendered against him, at least without the appointment of a representative who could legally act for him, and that in the opinion of her counsel the proper course was to sue for the annulment of the marriage. She did not want the notoriety of that procedure and in order to avoid it, or for some other reason of her own, entered into the collusive agreement with the plaintiff in that suit to conceal from the court facts which the parties to that agreement knew would in all probability defeat their purpose if revealed to the court. Revelation of the facts must inevitably have prevented the allowance of the alimony awarded and the parties to the agreement evidently thought that it might also prevent the granting of a divorce, as indeed it might have done if we may judge from the evidence in this case. If Crow was insane at the time of committing the acts charged as grounds for divorce, assuming he did commit them, and such acts resulted from his insanity, they could not be the basis of a decree of divorce. Our statute does not make insanity a ground of divorce. [Bethel v. Bethel, supra.] The agreement referred to was not collusive as between Crow and his then wife, plaintiff in the divorce suit. He knew nothing of it, and was mentally incapable of agreeing to it, or of realizing its import, had he been told of it. It was collusive against him and against the court. Because of such collusive action and the wrongful concealment of the facts from the court there was no contest offered in the divorce trial and no opportunity for Crow's side of the case to be presented. He never really had his day in court. Without pursuing the matter farther we think the facts show fraud perpetrated upon Crow and upon the court in the procurement of the judgment here assailed. See Gilliland v. Bondurant, 332 Mo. 881, 59 S. W. (2d) 679, where judgment against an infant was set aside for fraud in its procurement.

It is suggested by appellant that plaintiff Crow, by his guardian, had an adequate remedy at law by writ of error coram nobis, and therefore an action in equity will not lie. In Gibson v. Pollock, supra, that remedy was successfully invoked to set aside a judgment rendered against an insane person. In the course of its discussion the court said, 179 Mo. App. l. c. 191, "the judgment appears to be valid, and the only way he may have defense is to set it aside by writ of coram nobis, for error of fact not disclosed by the record." The court, however, was not considering the question whether or not an independent action in equity would lie to set aside a judgment or enjoin its enforcement for fraud in its procurement. Fraud in the procurement of the judgment was not alleged in that case. This court en banc held, in Simms v. Thompson, 291 Mo. 493, 236 S. W.

876, 881, that in this State relief is not granted by the writ *coram nobis* on the ground of fraud, "and doubtless would not be on the ground of accident or mistake, those being distinct grounds of relief in equity;" disapproving some prior cases on this point. [See, also, same case 236 S. W. l. c. 886; Schneider v. Schneider (Mo. App.), 273 S. W. 1081, 1083.]

In Hanson v. Neal, 215 Mo. 256, 284, 114 S. W. 1073, we said: "If the right asserted is a subject of original equity jurisdiction the court will entertain it even though there may be a remedy at law." [Citing cases.] In one of the cases cited, Stewart v. Caldwell, 54 Mo. 536, 539, it is said that "fraud belongs to the original jurisdiction, always exercised by a court of equity, and constitutes its 'most ancient foundation;' and such jurisdiction is not ousted because a remedy exists at law, for the jurisdictional powers, formerly possessed by that court, still continue unaffected by the enlargement which is taking place in the functions of the courts of law; and will not be extinguished by anything short of direct and prohibitory enactment."

In Smoot v. Judd, 161 Mo. 673, 687, 61 S. W. 854, we said: "The doctrine is thus stated by an able law writer: 'The power and jurisdiction of courts of equity to enjoin a party from enforcing a judgment which has been obtained, when it would be against conscience to permit him to do so, is at the present day so firmly established, so salutary in its operation, and so thoroughly in accord with the promptings of justice, that it is difficult to realize the stubbornness and bitter jealousy with which the beginnings of its exercise were resisted.' [1 Black on Judgments, sec. 365.]"

Appellant contends that where relief from a judgment is sought on the ground of fraud the plaintiff must come into court "with a cause unmixed with his own negligence or fault;" and must plead and prove that he had a meritorious defense in the case in which the judgment he seeks to set aside was rendered. Plaintiff certainly cannot be charged with fault or negligence in this case. He was insane and with no guardian when the judgment was rendered against him and so remained until Mr. Terry was appointed his guardian. This suit was filed within less than six months thereafter. In Gibson v. Pollock, supra, the proceeding to set aside the judgment was begun more than five years after entry of the judgment and eighteen months after the appointment of a guardian. It was held there was no laches.

In Sauer v. City of Kansas, 69 Mo. 46, it is said that "before a court of equity will enjoin a judgment at law, regular on its face, there must be some allegation and proof of injustice; and this injustice can only be shown by stating a defense which the court, before whom the petition is filed, considers a valid one." The court quotes, as stating the just rule, from Piggott v. Addicks (Iowa), 3

Greene, 427, that, "If it had appeared by the showing of the plaintiff that he had a meritorious defense to the claim, *or any part of it*, and that he had been deprived of making such defense," etc., the court should have opened the judgment. (Italics ours.) In 34 Corpus Juris, page 443, section 695, it is said: "It is not necessary to show conclusively that complainant has a sufficient cause of action or defense, but it suffices to establish good faith and tender a seriously litigable issue." [See, also, 34 C. J., p. 374, sec. 583; Hess v. Fox, 140 Mo. App. 437, 124 S. W. 83; Gilliland v. Bondurant, supra, distinguishing Sauer v. City of Kansas, supra, and Greenard v. Isaacson (Mo. App.), 220 S. W. 694.] We think that in the instant case plaintiff made a sufficient showing of a meritorious defense.

Lastly it is contended that this action cannot be maintained because not a direct but only a collateral attack on the judgment, "since the primary element of a divorce judgment is the dissolution of the bonds of matrimony and not the settlement of property rights," the latter being but incidental to the divorce. Missouri decisions are cited which hold that permanent alimony cannot be adjudged to a wife except she be granted a divorce. But when so awarded the judgment for alimony becomes a part of the judgment rendered. It is difficult to see how the fact that a judgment for alimony could not have been rendered absent a decree of divorce to the wife, can affect the question here raised, viz., whether a suit in equity to enjoin collection of the alimony judgment on the ground, here asserted, that the whole judgment is void or voidable for fraud in its procurement, is a direct or collateral attack. The Missouri decisions cited do not deal with this question. Appellant also cites and relies upon McCraney v. McCraney, 5 Iowa, 232, 68 Am. Dec. 702, holding that a judgment of divorce, alleged to have been procured by fraud, cannot be adjudged void in part and valid in part. That was a suit in equity to set aside a decree of divorce so far only as to give the plaintiff dower in the real estate and one-third of the personal estate of her former husband, then deceased. Years before the husband had obtained a divorce from the plaintiff, for her fault, whereby under the Iowa statute she forfeited dower and all other rights acquired by virtue of the marriage. The husband had remarried and his second wife survived him. If the divorce was valid, it, by operation of law, necessarily precluded the divorced wife from taking dower or any marital interest in her former husband's estate. The trial court adjudged that the divorce should be considered as valid so far as it dissolved the marriage and vacated only "to the extent sufficient to allow the complainant to recover her dower and distributive share of the personalty." It appears that such was the extent of the relief sought by the plaintiff's bill. The court pointed out the inconsistency of the trial court's decree in upholding the validity of the divorce in so far as it dissolved the marriage because of the

plaintiff's fault, thus by necessary legal effect cutting off the divorced wife's rights and interests in her former husband's estate, and at the same time decreeing to her those rights as if there had been no divorce. The court said such decree was both logically and legally inconsistent; that it "gives the complainant dower in the lands, and one-third of the personal estate, and at the same time, leaves so much of the sentence of divorce as dissolved the bonds of matrimony, in full force. It does not find that the coverture continued to the time of his death; nor that its non-continuance was occasioned by any fault or guilt on his part, and yet gives her dower to the same extent, and as fully, as if it did so continue. It, in effect, says, there may be dower, without the continuance of the matrimonial state."

In the case at bar the plaintiff in his petition and the court in its judgment did not recognize the validity of the divorce. Plaintiff challenged the validity of the whole judgment and sought to enjoin the enforcement of the part thereof which defendant was threatening to enforce to his damage. The court found "that the decree of divorce and judgment for alimony referred to in plaintiff's petition were obtained and procured by the defendant by means of fraud perpetrated by her on the court and on the plaintiff Edward Gay Crow," and that plaintiffs are entitled to the relief prayed, which it proceeded to adjudge. The relief adjudged is not inconsistent with the court's findings, nor is one part of the judgment inconsistent with another part thereof. We think the Iowa case cited is distinguishable from the case at bar. Moreover, it does not sustain appellant's contention that the suit in question is a collateral attack on the judgment. That question is not discussed.

That a court of equity has jurisdiction to restrain the enforcement of a judgment procured by fraud seems to be clearly recognized in Smoot v. Judd, supra, though the action in that case was one to set aside the judgment. In Jefferson City Bridge and Transit Company v. Blaser, 318 Mo. 373, 300 S. W. 778, the suit was by bill in equity to restrain the collection of certain tax assessments, and it was contended that the attack was collateral. The court reviewed authorities, referred to two sections of our statutes, now Sections 1505 and 1519, Revised Statutes 1929 (2 Mo. Stat. Ann., pp. 1662, 1672), and said, 318 Mo. l. c. 379, 300 S. W. l. c. 781:

"It thus appears that our statutory law has provided that in a proper case the enforcement of a judgment can be restrained by bill in equity, and whenever such a proceeding necessarily tends to impeach the judgment the enforcement of which is sought to be restrained, although it may not in terms seek to set aside, cancel or annul the judgment, the proceeding should be construed as a direct attack."

The reasoning and holding in Bridge and Transit Co. v. Blaser,

supra, sustain the authority of the court to grant injunctive relief in the instant case. In our opinion the judgment of the circuit court is right and it is affirmed. *Westhues* and *Fitzsimmons, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.